IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 12-cv-03350-RBJ

BRYAN A. LLOYD,

      Plaintiff,

v.

CAROLYN W. COLVIN[1], Acting Commissioner of the Social Security Administration,

      Defendant.

---

## ORDER

---

      This matter is before the Court on review of Magistrate Judge Kristin L. Mix's

recommendation to affirm the Commissioner's decision denying plaintiff Bryan Lloyd's

application for disability insurance benefits pursuant to Title II of the Social Security Act.

Jurisdiction is proper under 28 U.S.C. § 636(b)(1) and 42 U.S.C. § 405(g).  The Court generally

agrees with the magistrate judge and the administrative law judge.  However, because the Court

concludes that there is one issue as to which the ALJ's findings were incomplete, it remands the

case to the ALJ for further consideration of that issue.

**STANDARD OF REVIEW**

      This appeal is based upon the administrative record and briefs submitted by the parties.

In reviewing the recommendation of a magistrate judge, the role of the district court is to make a

de novo determination of any portion of the magistrate judge's report on which an objection has

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and thus her name is substituted for that of Michael J. Astrue as the defendant in this suit.  Fed. R. Civ. P. 25(d)(1). By virtue of the last sentence of 42 U.S.C. § 405(g), no further action needs to be taken to continue this lawsuit.

been properly made.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).  In reviewing a final

decision by the Commissioner, the role of the district court is to examine the record and

determine whether it "contains substantial evidence to support the [Commissioner's] decision

and whether the [Commissioner] applied the correct legal standards."  *Rickets v. Apfel*, 16

F.Supp.2d 1280, 1287 (D. Colo. 1998).  Substantial evidence is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Wilson v. Astrue*, 602 F.3d

1136, 1140 (10th Cir. 2010) (citations omitted).  Evidence is not substantial if it "constitutes

mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

       The Court "may neither reweigh the evidence nor substitute [its] judgment for that of the

agency."  *Harper v. Colvin*, 528 F. App'x 887, 890 (10th Cir. 2013) (citations omitted).  Thus,

although some evidence could support contrary findings, the Court "may not displace the

agency's choice between two fairly conflicting views," even if the Court might "have made a

different choice had the matter been before it de novo."  *Oldham v. Astrue*, 509 F.3d 1254, 1258

(10th Cir. 2007).  However, the Court must "meticulously examine the record as a whole,

including anything that may undercut or detract from the ALJ's findings in order to determine if

the substantiality test has been met."  *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007)

(citations omitted).  Upon review, the district court "shall have power to enter, upon the

pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision

of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

45 U.S.C. § 405(g).

## PROCEDURAL HISTORY

       Mr. Lloyd first applied for disability insurance benefits on May 12, 2009.  He claimed

inability to work since his alleged onset date of July 21, 2005, due to blindness in his left eye and

chronic obstructive pulmonary disease (COPD).  Mr. Lloyd has since amended his onset date to September 25, 2006, when he became a "person of advanced age."  Mr. Lloyd's last date insured was December 31, 2010.

The Commissioner denied Mr. Lloyd's application on October 21, 2009.  Mr. Lloyd then requested a hearing before an administrative law judge (ALJ), and the ALJ held a hearing on June 15, 2011.  On August 1, 2011, ALJ William Musseman issued an opinion denying benefits.  The Appeals Council denied Mr. Lloyd's request for review on November 9, 2012.  Thereafter, Mr. Lloyd filed a timely appeal with this Court.

## FACTS

Mr. Lloyd completed high school and four years of vocational college for trade school.  R. 39.  He spent his working life as a sheet metal journeyman.  R. 45, 100, 224.  However, he claims that he has been unable to work full time since July 21, 2005.  R. 99–100.[2]  In any event, no one disputes that Mr. Lloyd has not been gainfully employed since his amended onset date of September 25, 2006.  His last attempt at working was in 2009, when Mr. Lloyd helped a friend in his outfitting business for approximately two weeks.  R. 39, 99.[3]  Since leaving work, Mr. Lloyd has been able to support himself with the proceeds from a medical malpractice suit against Mercy Medical Center for the loss of vision in his left eye.  R. 39.

**Medical History Concerning COPD**[4]

---

[2] Try as we might, we have been unable to determine from the record whether his initial eye injury occurred in July 2005 or July 2006.  The parties' briefs likewise are inconsistent on this date.  It is not, however, critical to the Court's decision.

[3] The Court notes that there appears to be a typographical error on R. 39 describing this work as "out painting" instead of outfitting.

[4] Mr. Lloyd has lost virtually all use of his left eye.  However, the parties' arguments do not contend that the Commissioner's decision erred in any respect concerning Mr. Lloyd's loss of vision.  Because the analysis focuses on Plaintiff's COPD, the medical history discussed also focuses on that impairment.

On May 31, 2006, at age 54, Mr. Lloyd presented at the Mancos Valley Health Center in Mancos, Colorado complaining of a two-month history of shortness of breath and cough as well as chest congestion.  R. 180.  He was seen by Irene Rooney, Nurse Practitioner.  Mr. Lloyd reported a history of asthma and that he was out of his albuterol inhalers but had gotten some relief from his mother's DuoNeb.  He indicated that he had smoked in the past but quit 10 years earlier.  Ms. Rooney found that Mr. Lloyd had expiratory wheezing in all lung fields but with no rales or rhonchi.  Her assessment was that he was suffering from asthma exacerbation.  She prescribed medications to reduce Mr. Lloyd's symptoms.  *Id.*

On July 11, 2006, Mr. Lloyd was seen at the same clinic by Jeff McElwain, PA-C (Physician Assistant – Certified).  R. 179.  He reported ongoing cough with some yellow mucus, but with no significant shortness of breath, and some significant episodes of reflux.  Mr. McElwain found that Mr. Lloyd's lungs were clear, although there were slight decreased breath sounds throughout and a scattered wheeze.  His diagnosis was asthma and COPD, likely chronic bronchitis, and gastroesophageal reflux disease (GERD).  Mr. Lloyd indicated that he had seen health care professionals numerous times and had been placed on antibiotics, without complete resolution of his symptoms.  *Id.*  Mr. McElwain discontinued the antibiotics and recommended that Mr. Lloyd continue to use DuoNeb and albuterol.  He also prescribed Prevacid for the GERD.  *Id.*

On July 31, 2006, Mr. Lloyd returned to see Nurse Practitioner Rooney, complaining of a cough ongoing for two months.  R. 178.  He said that he had seen no improvement from his use of DuoNeb and albuterol, and that he had been given an injection by an allergist four days previously.  Ms. Rooney recorded that Mr. Lloyd told her that he continues to smoke.  She observed diminished breath sounds in all lung fields, but that it improved after an albuterol

nebulizer treatment, and that there was no wheezing, rales, or rhonchi.  Ms. Rooney recommended the use of Advair 250/50 twice daily, albuterol inhaler for "rescue," and DuoNeb by nebulizer.  Mr. Lloyd requested and received a referral to see a pulmonologist.  *Id.*

As indicated above, Mr. Lloyd's modified date of onset of disability is September 25, 2006 when he turned 55 years of age.

On October 31, 2006, Mr. Lloyd visited pulmonologist J. Allen Washburn, M.D.  He reported that that he had been experiencing worsening shortness of breath over the past year (although no breathing symptoms previously), with frequent exacerbation by cough and wheezing that required nebulizer treatments several times a day.  R. 143.  He indicated that since being placed on Advair 250/50 his breathing had much improved with exercise tolerance and decreased wheezing and shortness of breath.  He now has occasional symptoms that require the use of albuterol two to three times per week.  Several times each week he awakens during the night with wheezing and shortness of breath, but this resolves spontaneously.  He reported a chronic cough.  Mr. Lloyd told Dr. Washburn that he "remains active, hiking frequently in the mountains without respiratory difficulties and states that he hikes approximately 200 miles per year."   He indicated that he quit smoking 10 years ago but chews tobacco daily.  *Id.*

On examination, Dr. Washburn found that Mr. Lloyd's lungs were clear to auscultation without crackles or wheezing but with prolongation of the expiratory phase.  A pulmonary function test was performed, and the results are recorded at R. 144.  Dr. Washburn interpreted the test results as indicating "[m]oderate obstructive lung disease with post bronchodilator reversibility and airtrapping on lung volumes, diffusion was normal, and ABG [arterial blood gas] was normal."  *Id.*  Dr. Washburn diagnosed Mr. Lloyd with COPD.  R. 145.  He

recommended continued use of Advair and albuterol as needed and also encouraged Mr. Lloyd to engage in "regular activity to maintain his overall level of conditioning and health." *Id.*

On May 18, 2007 Mr. Lloyd returned to the Mancos Valley Health Center to re-establish care at that facility. He reported that he was still dealing with his eye injury, but that his breathing was doing well on Advair. R. 173.

On February 18, 2008, Mr. Lloyd was seen at the Mancos Valley Health Clinic for complaints of chest congestion and a cough with clear to yellow phlegm. R. 171. He reported that he was not using tobacco products. His lungs were clear to auscultation and percussion. It appears that he was primarily seen by a nurse, but Physician's Assistant McElwain signed off on the assessment of acute bronchitis. R. 172. Mr. Lloyd was prescribed a prednisone taper and doxycycline for COPD exacerbation should his condition not improve. He was advised to avoid cigarettes and to limit activity pending improvement in symptoms. *Id.*

On March 27, 2009, Mr. Lloyd presented to the Mancos Valley Health Clinic and was seen by Mr. McElwain. R. 168. He complained of a cough productive of clear sputum and slight fever over the previous three days, as well as waxing and waning shortness of breath. He reported that he had been using his inhaler with good results until his recent upper respiratory infection. Lungs were clear. Mr. McElwain diagnosed cough and asthma exacerbation and prescribed prednisone and continued use of his inhaler. He also diagnosed GERD and prescribed Zantac. *Id.*

On May 12, 2009 Mr. Lloyd filed his application for Social Security disability and disability insurance benefits. The Social Security office of Disability Determination Services in Aurora, Colorado referred him to the Southwest Memorial Hospital in Cortez, Colorado for

another pulmonary function test.  The test was performed on September 15, 2009.  The results are recorded at R. 215–22.

He was also referred by DDS to Eugene P. Toner, M.D. for a consultative evaluation. During the evaluation, which was performed on September 17, 2009, Mr. Lloyd told Dr. Toner that he had had asthma since he was a child, but that over the past four years his symptoms of shortness of breath and cough had become significantly worse after some smoke exposure.  He also indicated that he had episodes that required prednisone two or three times per year, and that during these episodes his cough becomes much more productive, he is forced to use a nebulizer twice or more per day, and he awakens short of breath.  He indicated that he had not smoked for 14 years.

He indicated that he lives with his 38-year old stepson and spends his day doing short amounts of yard work, napping, reading and riding horses.  He said that he could stand with no problem, sit for several hours, lift 50 pounds, and drive 40 miles.  However, he said that he was unable to climb stairs, and that after he walks about 200 yards he feels pressure in his chest and coughs up a lot of white sputum.  He reported that he had been a sheet metal worker for 40 years but had stopped because a physician had told him that metal work put his good eye at risk, and that his loss of peripheral vision made it dangerous for him to be around heavy moving objects. *Id.* at 223–24.

Dr. Toner noted that Mr. Lloyd's October 31, 2006 pulmonary function test "showed a moderate obstructive airway disorder that was immediately responsive to a bronchodilator."  He also indicated that Mr. Lloyd's blood gas reports showed that his $PO_2$ was 74.2, and his $PCO_2$ was 39.3.  *Id.*  It does not appear that Dr. Toner had the results of the pulmonary tests performed two days earlier at the Southwest Memorial Hospital, as there is no reference to those tests or

results in his report.  Upon examination Mr. Lloyd's lungs had "almost absent breath sounds" but "no rales or rhonchi could be appreciated."  R. 224.  Dr. Toner's assessment was that Mr. Lloyd suffers from chronic obstructive pulmonary disease (COPD) with exertional dyspnea and complete vision loss of his left eye.  R. 225.  According to Dr. Toner, Mr. Lloyd's

> pulmonary function apparently interferes with his ability to do much in the way of any exertional work.  He is unable to climb stairs.  He states he can lift 50 pounds but, again, I feel that this is something that he could [not] do more than once.  I also feel like his walking is restricted to perhaps ten minutes at a time for a total of an hour a day.

*Id.*

DDS then referred Mr. Lloyd's case to another consultative evaluator, Michael Canham, M.D., who is a specialist in the field of pulmonology.  Dr. Canham did not examine Mr. Lloyd.  Instead, on October 15, 2009, he reviewed Mr. Lloyd's case file and filled out a Physical Residual Functional Capacity Assessment.  R. 227–234.  His evaluation was primarily based on test results.  He cited a test from July 2006 showing an oxygen saturation of 91% at an altitude of greater than 6000 feet.  R. 228.  Then, in October 2006 the pulmonary function test indicated that his FEV1 was 2.42 liters, and that his DLCO was 72%.  According to Dr. Canham, the FEV1 "is not severe" and the DLCO "would suggest that [Mr. Lloyd] does not have significant exercise oxygen dissociation."  *Id.*  Also in October Mr. Lloyd's oxygen saturation at rest was 98%, and with walking it dropped to 93%.  *Id.*  At that time, Mr. Lloyd's ABGs were "entirely normal" for a person living at an altitude of 6000 feet.  R. 229.  Dr. Canham also discussed the pulmonary function test that Mr. Lloyd had on September 15, 2009.  Mr. Lloyd's FEV1 of 2.77 liters as measured in this test "would be a not severe impairment by SSA, but a moderate obstructive defect."  *Id.*

Dr. Canham's Physical Residual Function Capacity Assessment, based upon his pulmonary analysis (he did not attempt to evaluate the blindness issue) was that Mr. Lloyd could occasionally "lift and/or carry" 50 pounds; frequently "lift and/or carry (including upward pulling)" 25 pounds; "stand and/or walk (with normal breaks)" about six hours in an eight hour workday; "sit (with normal breaks)" about six hours in an eight hour workday; and "push and/or pull (including operation of hand and/or foot controls)" R. 228.[5]

Dr. Canham expressed the opinion that Mr. Lloyd's "physiology shows that he is capable of a significant amount of workload." R. 232.  Dr. Canham acknowledged Dr. Toner's finding of diminished breath sounds.  R. 229.  But he stated, "[t]he conclusions of Dr. Toner are not supported by the evidence as he does not address the clmt's normal gas exchange, not severe spirometry, the fact that he is working at a very high elevation of 6,900 ft which also accounts for some of his respiratory symptoms and not necessarily cardiopulmonary disease.  Consequently, the greatest weight is given to the physiology."  R. 233.

**Denial of the Claim**

Mr. Lloyd's claim was initially denied on October 21, 2009.  He appealed, and a hearing was eventually held before ALJ Musseman on June 15, 2011, resulting in a written decision issued on August 1, 2011 finding that Mr. Lloyd was not disabled within the meaning of the Social Security Act through December 31, 2010, his last date insured.  ALJ Hearing Decision at

---

[5] The quoted phrases such as "lift and/or carry (including upward pulling)" are from a printed SSA form. Dr. Canham checked the boxes on the form corresponding to the numbers listed above.  The Court notes that the form's use of "and/or" to link two functions together, i.e., lift and/or carry, stand and/or walk, push and/or pull, creates an ambiguity that Mr. Lloyd's counsel has cited in arguing that there has been no function by function finding on the seven of the critical functions of sitting, standing, walking, lifting, carrying, pushing, and pulling.  In this Court's view, the ambiguity could easily be avoided by revising the form.

1–9.[6]  The ALJ's decision became the final appealable action of the Commissioner upon the SSA

Appeals Council's denial of review on November 9, 2012.

Returning to the ALJ decision, the Social Security Administration uses a five part process

to determine whether a claimant qualifies for disability insurance benefits.  20 CFR § 404.1520.

At **step one**, the ALJ must determine whether the claimant is engaging in substantial gainful

activity.  20 CFR § 404.1520(a)(4)(i).  The ALJ found that Mr. Lloyd had not engaged in

substantial gainful activity since July 21, 2005 (more than one year prior to modified onset date)

through his date last insured.  ALJ Hearing Decision at 3.

At **step two**, the ALJ must determine whether the claimant has a medically determinable

impairment that is "severe" or a combination of impairments that are "severe."  20 CFR §

404.1520(a)(4)(ii).  The ALJ found that Mr. Lloyd suffered from the following severe

impairments: Chronic Obstructive Pulmonary Disease (COPD) and blindness in his left eye.  R.

12.  The ALJ also found the following non-severe impairments: prostate cancer and an arterial

fibrillation.  R. 12–13.

At **step three**, the ALJ must determine whether the claimant's impairment or

combination of impairments meets or medically equals the criteria of an impairment listed in 20

CFR Part 404, Subpart P, Appendix 1 (the "Listings").  20 CFR § 404.1520(a)(4)(iii).  The ALJ

determined that none of Mr. Lloyd's impairments—alone or in combination—met or medically

equaled one of the listed impairments in the Listings.

The ALJ analyzed Mr. Lloyd's first severe impairment, COPD, per the listing for chronic

pulmonary insufficiency found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.02.  The listing

requires a forced expiratory volume (FEV) equal to or less than 1.35 as measured by a

---

[6] Oddly, the numbering of pages in the record stops after page 7 and resumes at page 22.  If the pagination had been included, the ALJ Hearing Decision would be pages 10–18.  However, I will cite that portion of the record by the ALJ's original numbers.

spirometry stud.  Mr. Lloyd's FEV exceeded this value (in both the 2006 and 2009 spirometry

tests).  The ALJ found that Mr. Lloyd's COPD did not meet the required listing.  *Id.* at 4.

The ALJ analyzed Mr. Lloyd's second severe impairment, blindness in his left eye, under

the listing for loss of visual acuity, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 2.02.

This listing requires that the remaining vision in the better eye after best correction be 20/200 or

less.  In addition, 20 CFR § 404.130(e) provides that an individual may be entitled to benefits if

he is disabled by blindness as defined in Section 404.1581 and is fully insured.  Under 20 CFR §

404.1581, statutory blindness is defined as central visual acuity of 20/200 or less in the better eye

with the use of correcting lenses.  An eye which has a limitation in the field of vision so that the

widest diameter of the visual field subtends an angle no greater than 20 degrees is considered to

have a central visual acuity of 20/200 or less.  20 CFR § 404.1581.  Since Mr. Lloyd's remaining

vision in his right eye is better than 20/200, the ALJ found that he does not meet these listings.

*Id.*

Before reaching step four, the ALJ is supposed to determine the claimant's residual

functional capacity (RFC).  *See* R. 11; 20 CFR § 404.1520(a)(4)(iv).  An RFC represents "the

most [a claimant] can still do despite [his] limitations."  20 C.F.R. § 404.1545(a)(1).  The RFC is

"the claimant's maximum sustained work capability."  *Williams v. Bowen*, 844 F.2d 748, 751

(10th Cir. 1988).

The ALJ found that Mr. Lloyd has an RFC to perform "medium work" as defined in 20

CFR § 404.1567(c), except that he must avoid exposure to the extremes of cold and hot, as well

as hazardous work areas; have minimal contact with dust, smoke and chemicals; and, because of

his monocular vision, not perform work that requires binocular vision.  *Id.* at 7.[7]  The ALJ cited

the results of the oxygen saturation and pulmonary function tests in 2006 and the additional test

result from 2009.

The ALJ added that he traditionally has given great weight to the opinions of the treating

physician, but no such opinion was available in this case.  *Id.*  He acknowledged Dr. Toner's

opinions, but he found that his opinions were inconsistent with the medical evidence of record.

*Id.* at 6, 7.  Specifically, he cited the pulmonary function tests from 2006 and 2009 and the fact

that the record indicates that medications have generally been successful in controlling the

symptoms.  He also noted that Dr. Canham explained why Dr. Toner's opinions were not

supported by the medical evidence.  *Id.* at 7.  The ALJ elected to give the Toner opinions little

weight and the Canham opinions great weight based on the consistency (Canham) and relative

inconsistency (Toner) of their opinions with the objective medical evidence.  *Id.*

The ALJ acknowledged, however, that a claimant's symptoms can sometimes suggest a

greater level of severity of impairment than can be shown by the objective medical evidence.  He

noted that Mr. Lloyd asserts that between his onset date and date last insured he suffered from

COPD and left-eye blindness; shortness of breath, pain in his lower back, high blood pressure,

and cloudy vision; that he is easily fatigued; and that he has reported problems with lifting,

standing, walking, climbing stairs, seeing, and completing tasks.  He further acknowledged that

when the claimant's statements about the intensity, persistence or functionally limiting effects of

pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make

---

[7] "Medium work" under the regulation "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  A person who can do "medium work" is deemed also to be able to do light and sedentary work.  20 C.F.R. § 404.1567(c).

a finding on the claimant's credibility. *Id.* at 5. The ALJ listed factors, per 20 C.F.R. §

416.929(c), that can be considered in assessing credibility.[8]

The ALJ did not apply these factors in so many words. Rather, he wrote:

> After careful consideration of the evidence the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of those symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment. In addition, the claimant's work history is week (sic) with sporadic and inconsistent jobs.

*Id.* at 5–6.

The ALJ further found that two factors weighed against considering Mr. Lloyd's

allegations as strong evidence in favor of a disability finding: (1) his "allegedly limited daily

activities cannot be objectively verified with any reasonable degree of certainty;" and (2) "even

if [his] daily activities are truly as limited as alleged, it is difficult to attribute that degree of

limitation to [his] medical condition, as opposed to other reasons, in view of the relative weak

medical evidence and other factors discussed in this decision." *Id.* at 6–7. He added that Mr.

Lloyd has been able to attend to his personal needs, clean the house, vacuum, mow the grass,

care for his horses, do his laundry, prepare his meals, do the dishes, and go shopping, and

manage his personal finances, activities which he found to be consistent with his RFC

determination. *Id.* at 7.

---

[8] These factors are (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the complainant's functional limitations and restrictions due to pain or other symptoms.

At **step four**, the ALJ must determine whether the claimant has the residual functional capacity to perform the requirements of his past work. *Id.* at 2–3. During the hearing, the ALJ asked Reva D. Payne, a vocational expert, to assume hypothetically an individual of the same age and educational background as Mr. Lloyd, limited to an exertional level in the full range of medium but with nonexertional limitations of monocular vision, minimal exposure to dust, smoke, and chemicals, no temperature extremes and no hazardous work areas. Ms. Payne testified that such a claimant could not perform the requirements of Mr. Lloyd's past work. R. 44–45. The ALJ adopted this determination as to Mr. Lloyd. ALJ Hearing Decision at 8.

Finally, at **step five**, the ALJ must determine whether the claimant is able to do any other work that exists in significant numbers in the national economy considering the claimant's RFC, age, education, and work experience. *Id.* at 3. Ms. Payne testified at the hearing that there are jobs that the hypothetical person described could perform. She provided examples of a change person, a dining room attendant, and a sandwich maker and testified as to the numbers of those jobs that she believed were available in Colorado and nationally. R. 45–46. However, when the ALJ added to the hypothetical that (as Mr. Lloyd had testified) if the claimant could stay on task only about 30 minutes but would then need a 10-minute break before returning to the task, then that would not be tolerated in a competitive work environment. *Id.* at 46.

Based on Ms. Payne's testimony (but discounting the additional limitation derived from Mr. Lloyd's testimony), the ALJ determined that Mr. Lloyd could perform medium level unskilled work such as the three occupations that Ms. Payne had provided as examples. Accordingly, the ALJ concluded that Mr. Lloyd was not entitled to disability benefits under the Act. ALJ Hearing Decision at 8–9.

**Magistrate Judge Recommendation**

Following Mr. Lloyd's filing this case, and full briefing by the parties, the Court referred the matter to Magistrate Judge Mix.  On December 12, 2013 Judge Mix issued a detailed and thorough order recommending that the ALJ's decision be affirmed.  [ECF No. 22].  Mr. Lloyd, through counsel, filed a timely objection.  [ECF No. 23].  The Commissioner filed a response to the objection.  [ECF No. 24].  The issues raised in Mr. Lloyd's objection are now before the Court for de novo review.

**ANALYSIS**

Mr. Lloyd makes three objections to the Recommendation of Magistrate Judge Mix.  In their simplest form, his objections are that (1) the ALJ's credibility analysis of Mr. Lloyd was not performed properly; (2) the ALJ failed properly to consider the opinion of Dr. Toner; and (3) the ALJ failed properly to address the seven specific functions of sitting, standing, walking, lifting, carrying, pushing, and pulling as required by SSA regulations and rulings.  I agree with Mr. Lloyd as to his first and, at least in part, his third objection.

**A. Credibility Assessment**

As indicated above, Mr. Lloyd has indicated during various visits to health care professionals that he experiences shortness of breath and that he has problems with physical actions such as lifting, standing, walking, and climbing stairs.  ALJ Hearing Decision at 5.  To a limited extent Mr. Lloyd described some of these limitations in answers to the ALJ's questions at the ALJ hearing:

> Q  What type of situations cause you to be short of breath?
>
> A  Exertion.  I mean, you know, I can work for – I don't know.  If it's heavy lifting or exerting work, maybe 20, 30 minutes, then I have to sit down.
>
> Q  Okay.  How long do you have to sit down?
>
> A  At least five to ten minutes.

Q  So, every 20 to 30 minutes you've got to take a ten-minute break from doing any –

A  Approximately.

Q  -- kind of activity before you can go back to that activity?

A  Approximately, yes, sir.

R. 40.

. . .

Q  Okay.  What I want you to do for me at this point, then, Mr. Loyd [sic], is just in your own words tell me why it is you feel like you're unable to work and should be garnering these benefits.

A  Well, the simple reason I can't do the trade that I came up in when I was 16 years old and I did all my life.  It's messing with machines.  The doctor doesn't really want me – in this eye and I can't see, you know.  To right here I can see, but then it disappears.  Running machines and duct work and messing with sheet metal, being such a sharp object, and then it's an exerting field of work as far as heavy lifting and, you know, different things like that.  And it's just – I don't have the air and am sure there's not a company around that's going to let me sit down every 30 minutes, 30-45 minutes.

Q  All right, sir, that's the questions I have.  Is there anything else that you want to tell me or think I need to know.

A  No, sir, I think we've covered it all.

R. 43–44.

The ALJ found that although Mr. Lloyd's medically determinable impairments could reasonably be expected to cause such symptoms, the objective medical evidence actually obtained--particularly the pulmonary function tests, as well as the evidence regarding the effectiveness of the medications Mr. Lloyd received--did not support the limitations in this instance.  There is substantial evidence in the record that supports those findings.

Importantly, however, the ALJ also recognized that because Mr. Lloyd's description of the functional limits of his condition was not substantiated by the objective medical evidence, he had to make a finding as to the credibility of Mr. Lloyd's statements.  As he acknowledged, sometimes a claimant's symptoms can suggest a greater level of severity of impairment than the medical evidence suggests.

16

The problem is, having correctly described his task, the ALJ's resolution of the credibility issue was not, in my view, adequate.  Specifically, my problem lies with the ALJ's basing his credibility determination on (1) "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment;" and (2) "[i]n addition, the claimant's work history is week (sic) with sporadic and inconsistent jobs."  ALJ Hearing Decision at 6.

Taking his second reason first, there is simply no support in the record for the finding that Mr. Lloyd's work history was weak.  The record is that he worked in the sheet metal industry for approximately 40 years.  R. 100, 224.  There is no indication in the record that his career was sporadic or inconsistent.  The Commissioner does not dispute this but instead argues (and the magistrate judge agreed) that any error was harmless, because the credibility evaluation was supported by other considerations.  [ECF No. 16 at 11 and No. 24 at 3].  I do not agree that it was harmless in this case.  The very fact that the ALJ cited the poor work history as one of two factors that supported his credibility determination tells me that he believed it was a factor of importance.  My colleague Judge Daniel has held that it is error for an ALJ not to consider a claimant's good work history in his analysis of credibility.  *See Wegner v. Astrue*, No. 08CV703-WJD, 2009 WL 3158129, at *10 (D. Colo. Sept. 28, 2009).  Similarly, my colleague Judge Kane has said "[w]here a claimant has a good work history, she is entitled to substantial credibility when she then asserts that she is unable to work."  *Tyson v. Apfel*, 107 F. Supp. 2d 1267, 1270 (D. Colo. 2000).  Work history is not a determinative factor, but if it is to be considered, it should be considered accurately.

I am also troubled by the ALJ's use of the boilerplate phrase, "not credible to the extent they are inconsistent with the above residual function assessment." This phrase might not be objectionable per se. *See Holbrook v. Colvin*, 521 F. App'x 658, 664 (10th Cir. 2013) (unpublished) ("[C]onclusory language is problematic only when it appears in the absence of a more thorough analysis, not when . . . the ALJ's decision referred to specific evidence in support of its conclusions.") (internal quotation marks and citations omitted). But it is problematic when there is an absence of other factors bearing on the claimant's credibility. *See id.* at 663–64.

The Seventh Circuit has elaborated on the dangers of relying on such boilerplate language and the difficulty it poses to reviewing judges who are attempting to parse through the ALJ's reasoning. *Bjornson v. Astrue*, 671 F.3d 640, 644–46 (7th Cir. 2012) (rejecting identical language as "opaque" and "backward" because it circularly allowed an ALJ to reach a conclusion about a claimant's ability to work by rejecting a claimant's testimony and then using that same disputed conclusion to justify rejecting the claimant's testimony in the first place). Although courts generally defer to an ALJ's credibility determinations, "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.* at 663 (citing *Hackett v. Barnhart*, 385 F.3d 1168, 1173 (10th Cir. 2005)).

The essence of the ALJ's credibility finding appeared to be, quite simply, that Mr. Lloyd's description of his limitations was not credible because it was inconsistent with the ALJ's RFC assessment. But the credibility of the claimant should be a factor in determining the RFC, not something that one backs into as a result of an RFC determined without consideration of the claimant's credibility. Put another way, it clearly is appropriate to consider the objective medical evidence in determining the claimant's credibility; but if one's credibility is measured solely by whether it comports with the objective evidence, then it might as well not be considered at all.

That this is, in fact, what occurred. It is confirmed by the ALJ's later finding that two factors weighed against the claimant's description of the limits on his daily activities. One factor was that the limits were not objectively verified. The other was that they were hard to accept in view of the relatively weak medical evidence. ALJ Hearing Decision at 6–7. But in substance these findings were just another way of saying that Mr. Lloyd's statements and testimony are not credible because they are inconsistent with the objective medical evidence.

I do acknowledge that the ALJ mentioned certain daily activities that he found were consistent with his RFC determination: attending to his personal needs, preparing meals, cleaning and laundry, mowing the grass, and caring for his horses (none of which were discussed during the ALJ hearing).[9] An ALJ is entitled to consider the claimant's daily activities in assessing the credibility of his claim of disability. *Hamilton v. Sec'y of Health & Human Services of U.S.*, 961 F.2d 1495, 1499 (10th Cir. 1992). However, the "sporadic performance [of household tasks or work] does not establish that a person is capable of engaging in substantial gainful activity." *Frey v. Bowen*, 816 F.2d 508, 516–17 (10th Cir. 1987).

Here, Mr. Lloyd admitted in his Function Report that he could do the listed activities. R. 109–10. However, he also indicated in the same Report (but the ALJ did not) that he could only clean, vacuum, tend to his horses, and mow the grass for maybe an hour at a time before he had to rest. R. 110.[10] Mr. Lloyd testified at the ALJ hearing that when it came to exerting work such as "heavy lifting and, you know, different things like that," he had to rest every 30-45 minutes. R. 43–44. The vocational expert testified that if Mr. Lloyd could only stay on task for about 30 minutes before needing a 10 minute rest break, he could not obtain competitive employment. *Id.*

---

[9] Interestingly, the ALJ did not comment on Dr. Washburn's note that Mr. Lloyd had indicated in October 2006 that he was continuing to be actively engaged in hiking in the mountains.

[10] Mr. Lloyd's counsel suggests that Mr. Lloyd wrote that his horses mow the grass. I do not read it that way.

at 46.  These alleged limitations were not mentioned by the ALJ.  It is not necessary that the ALJ mention every piece of evidence in his written decision.  But, it is necessary that the decision show that the claimant's credibility was carefully considered.

The reason that courts generally defer to an ALJ's credibility determination is that the ALJ, like trial judges and juries, sees and hears the witnesses and is in a better position to evaluate firsthand such factors as their manner, demeanor, and strength of memory.  I am in as good a position as the ALJ to assess whether Mr. Lloyd's complaints are consistent with the objective medical evidence contained in the record.  But I am not in as good a position to form an impression based on observation of his testimony at the hearing as to whether the claimant appears to be sincere or instead to be exaggerating to make his case stronger.

In this instance, the hearing did not produce as much information as it might have.  Mr. Lloyd appeared in person for the hearing, without counsel.  He did not do much to explain how his pulmonary condition prevented him from doing work that might be less physical than his previous work.  He did not call any other witnesses, such as his stepson with whom he lives or other individuals who might be in a position to describe, under oath, what they have observed about his ability to exert himself.  He did not call any medical professionals who have observed him over time, or explain in what ways the objective medical evidence on record conflicted with his subjective symptoms.

But the ALJ also has a responsibility to probe where probing is needed.  "The ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360–61 (10th Cir. 1993).  The duty is one of inquiry as well as factual development, so as to ensure "that the ALJ is informed about facts relevant to his

decision and learns the claimant's own version of those facts." *Id.* at 361 (internal quotation marks and citations omitted).  In effect, the ALJ allowed Mr. Lloyd to testify as to the information Mr. Lloyd believed was relevant, without probing for more detail or further explanation.  Given the ALJ's duty of inquiry, I cannot in good faith hold it against Mr. Lloyd that his testimony did not address more relevant information, in particular the inconsistencies between his reported limitations and the objective medical evidence.

I conclude that the case should be remanded for further consideration of Mr. Lloyd's credibility.  In doing so I express no opinion on what the credibility assessment should be or on what the ultimately disability determination should be.

## B. Dr. Toner's Opinions.

Mr. Lloyd argues that the ALJ erred in giving Dr. Toner's opinion little weight as compared to Dr. Canham's opinion which was given great weight.  He reminds us that "[t]he opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all." *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).

In the first place, I note that according to Mr. Lloyd's opening brief, his "primary treating medical provider" during the subject period was Mr. McElwain, the Physician's Assistant whom he saw several times at the Mancos Valley Health Clinic.  [ECF No. 15 at 9].  The ALJ had the Mancos records.  But, having reviewed those same records, I agree with the ALJ (and Mr. Lloyd does not argue otherwise) that they did not provide a treating provider's opinion that he could consider or to which he might defer.[11]

---

[11]  The ALJ could not have known that Mr. McElwain wrote a letter to Mr. Lloyd dated September 19, 2011 in which he confirms that Mr. Lloyd suffers from GERD, COPD, left eye blindness and prostate cancer but adds: "All of these medical problems have combined to the degree that he is unable to work at his usual occupation. *He would be a good candidate for job retraining.*"  R. 291.  (emphasis added).

As for the weight the ALJ gave the evaluations of Dr. Toner and Dr. Canham, I accept the proposition that, all other things being equal, the opinions of a physician who examines the patient would receive more weight than a physician who did not. However, the ALJ provided specific reasons as to why, in this instance, all other things were not equal. The ALJ cited Dr. Canham's finding that Dr. Toner did "not address the claimant's normal gas exchange, non severe spirometry, or the fact that [Mr. Lloyd] is working at a very high elevation of 6,900 feet which also accounts for some respiratory symptoms . . . ." ALJ Hearing Decision at 7. The ALJ also found that Dr. Toner's opinion "was inconsistent with the evidence of record, as the PFT's (pulmonary functions tests) were mostly normal and the claimant does not require supplemental oxygen . . . ." *Id.* In contrast, the ALJ found the analysis of the pulmonary test results (both from 2006 and 2009) by Dr. Canham, who is a pulmonary specialist, convincing and gave his opinion more weight accordingly.[12]

The Court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005). The Court must evaluate an ALJ's decision "based solely on the reasons stated in the decision" in order not to "overstep our institutional role and usurp essential functions committed in the first instance to the administrative processes." *Robinson v. Barnhart*, 366 F.3d 1078, 1084–85 (10th Cir. 2004). An ALJ's decision must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave . . . and the reasons for that weight." *Oldham*, 509 F.3d at 1258 (citations omitted). *See Gonzales v. Colvin*, 515 F. App'x 716, 719 (10th Cir. 2013) (unpublished) (finding that the ALJ did not improperly "reject" the opinion of a treating

Because this letter was not part of the record before the ALJ, I do not consider it in determining whether the ALJ's decision is supported by substantial evidence in the record. This letter was included in "attorney-supplied evidence" presented to the Appeals Council.
[12] This specialty factor may properly be considered. *See* 20 C.F.R. § 404.1527(c)(5).

physician nor improperly rely on a nonexamining physician's opinion; rather, the same record evidence undermining the treating physician's opinion supported the non-examining physician's opinion, and thus the ALJ was entitled to give greater weight to the latter's opinion).

The Court concludes that the ALJ provided sound reasons for giving Dr. Toner's opinion little weight. Those reasons were supported by substantial evidence on the record. The Court therefore adopts the recommendation of Magistrate Judge Mix and affirms the decision of the Commissioner on this issue.

### C. Seven Functions

According to Social Security Ruling 96-8p, an RFC assessment must address both the exertional and nonexertional capacities of the individual. 1996 WL 374184, at *5 (July 2, 1996). Exertional capacity "addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of the seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be addressed separately." *Id.* The SSR acknowledges that the regulations describing exertional levels of work pair some of the functions. However, "it is not invariably the case that treating the activities together will result in the same decisional outcome as treating them separately." *Id.*

Similarly, 20 C.F.R. § 404.1545(b), which addresses the assessment of one's physical abilities for an RFC determination, states that "a limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce your ability to do past work and other work." The ALJ must consider those factors in his RFC assessment. *Baker v. Barnhart*, 84 F. App'x 10, 13 (10th Cir. 2003).

It is undisputed that the ALJ's decision did not include a function by function assessment of the seven functions in so many words.  The Commissioner's argument is that the ALJ's finding that Mr. Lloyd was capable of performing medium work as defined at 20 C.F.R. § 404.1567(c) "assumes that he was capable of performing substantially all of the exertional functions (sitting, standing, walking, lifting, carrying, pushing, and pulling) required in work at that level."  That is a bit like assuming that the light was green because the driver entered the intersection.

In this instance the ALJ gave Dr. Canham's opinions great weight.  Dr. Canham's "Physical Residual Functional Capacity Assessment" found that Mr. Lloyd could "occasionally lift and/or carry (including upward pulling)" 50 pounds, and that he could "frequently lift and/or carry (including upward pulling)" 25 pounds.  R. 228.  Dr. Canham's assessment also addressed standing and/or walking, sitting, and pushing and/or pulling, including upward pulling.  R. 228. He also addressed other physical functions listed in 20 C.F.R. § 404.1545(b), i.e., postural functions (climbing ramps and stairs, balancing, stooping, kneeling, crouching and crawling, all of which Dr. Canham found Mr. Lloyd capable of doing frequently) and manipulative functions (reaching, handling, fingering, and feeling, as to which he believed Mr. Lloyd had no limitation). R. 229–30.  One could perhaps infer that the ALJ considered the seven functions, even though he did not expressly address them.

But that is not what Social Security Ruling 96-8p requires.  Social Security Rulings do not have the force and effect of law or regulations.  However, "[t]hey are binding on all components of the Social Security Administration."  20 C.F.R. § 402.35(b)(1).  The rulings represent "precedent final opinions and orders and statements of policy and interpretations that [the Commissioner has] adopted."  *Id.*  They are to be relied upon as precedents in adjudicating

24

cases.  *See* Social Security Rulings: Preface, *available at*

http://ssa.gov/OP_Home/rulings/rulings-pref.html.

While SSR's may be superseded, modified, or revoked by higher authorities, including

court decisions, *see id.*, I have found no case law or other authority holding either that the seven

functions must be expressly discussed in ALJ hearing decisions or that they need not be.  At a

minimum, however, it is the better practice.  Because this case is already being remanded for a

new credibility determination, I also request that the ALJ provide a function-by-function

assessment before completing his analysis of Mr. Lloyd's residual functional capacity.  I add that

in future cases, it would be helpful as well as good practice for this ALJ and others to adhere to

the policy enunciated in the SSR and provide a function-by-function assessment in their hearing

decisions.

**ORDER**

1.  The recommendation of the magistrate judge [ECF No. 22] is ACCEPTED IN PART

AND REJECTED IN PART.

2.  The case is REMANDED to the ALJ for further findings consistent with this opinion.

DATED this 6th day of February, 2014.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge